**SAMMONS et al. v. COLONIAL PRESS, Inc., et al.**

**COLONIAL PRESS, Inc., v. SAMMONS et al.**

**Nos. 3735, 3736.**

Circuit Court of Appeals, First Circuit.

Feb. 20, 1942.

Rehearing Denied March 12, 1942.

---

Robert V. Jones, of Chicago, Ill. (Arthur Thad Smith, of Boston, Mass., on the brief), for Sammons and others.

Stanley G. Barker, of Worcester, Mass. (Thayer, Smith & Gaskill, of Worcester, Mass., on the brief), for Colonial Press, Inc.

No appearance or argument for other appellee.

Before MAGRUDER, MAHONEY, and WOODBURY, Circuit Judges.

MAGRUDER, Circuit Judge.

These are cross-appeals in a suit for copyright infringement.

The main question is whether under § 25(b) of the Copyright Act of 1909, 35 Stat. 1081, 17 U.S.C.A. § 25(b), a contract printer is jointly liable with the infringing

344

publisher for the profits which the latter made from sales of the infringing book, the plaintiffs having offered no evidence of actual damages from the infringement. We think the district court correctly answered this question in the negative.

One Larkin got up a book called "Who's Who in Massachusetts." Through reference and introduction by the University Press, Larkin got in touch with the Colonial Press, Inc., and on May 8, 1939, a contract was made between them whereby Colonial Press agreed to print 3,000 copies of the book, of which 1,000 copies were to be bound, for a total price of $7,500. Colonial Press obligated itself to pay to University Press a commission of $994 for forwarding the job.

Colonial Press is a book manufacturer. It does the actual mechanical work involved in producing books—the printing, electrotyping, stitching and binding—after receiving manuscripts from publishers. It is not engaged in the publication of books.

Larkin began furnishing manuscript in May, 1939. Colonial Press made its first delivery of books to Larkin on December 6 of that year. On February 8, 1940, the plaintiffs (a partnership doing business as the A. N. Marquis Co.) gave written notice to Colonial Press that the book "Who's Who in Massachusetts" constituted an infringement of the plaintiffs' copyrighted book "Who's Who in New England." Printing was stopped by Colonial Press on February 26. In the period between February 26 and April 12, 1940, when deliveries ceased, Colonial Press delivered to Larkin between 1,500 and 2,000 books. In all, 2,-812 books were delivered. Larkin sold 2,-280 volumes of his work for $18,795.

The plaintiffs' complaint, filed in the court below, joined Larkin and the Colonial Press, Inc., as co-defendants, and after setting forth the ownership by plaintiffs of the copyright of the book "Who's Who in New England," charged that "the defendants infringed said copyright by printing, publishing, selling and placing upon the market a book entitled 'Who's Who in Massachusetts.'" A second count for trademark infringement and unfair competition by the defendants acting jointly and for their mutual profit was dismissed by the court with prejudice, upon motion by the plaintiffs.

The district court made findings that the accused book infringed the plaintiffs' copyright; that Larkin made a net profit of $7,-236.50 from sales of the book; that Colonial Press realized no net profit out of its printing contract. It ruled that Colonial Press, though it acted in good faith and was not a conscious and deliberate infringer, was nevertheless liable for infringement, along with the publisher Larkin, because it was "the combined effort of Colonial and Larkin that placed the infringing book upon the market." However, the district court ruled that the Press was not jointly accountable with Larkin for the profits Larkin made.

On the basis of the foregoing, the court permanently enjoined the two defendants from further infringement, gave judgment against Larkin for his profits of $7,236.50, together with costs, including $1,500 for attorney's fee, and gave judgment against Colonial Press for $250 and costs. The sum assessed against the Press was "in lieu of actual damages and profits" and was the minimum amount permissible under § 25(b).

The plaintiffs and the defendant Colonial Press each took an appeal from this judgment. Larkin did not appeal. The correctness of the finding of infringement is not now challenged, nor is any issue raised as to the amount of Larkin's profits.

The chief contention of the plaintiffs in their appeal is that the court below should have held Colonial Press jointly liable for the profits made by Larkin.

Under § 25(b) any person infringing a copyright is liable "to pay to the copyright proprietor such damages as the copyright proprietor may have suffered due to the infringement, as well as all the profits which the infringer shall have made from such infringement * * *." In lieu of actual damages and profits such damages shall be assessed "as to the court shall appear to be just," within prescribed maximum and minimum limits.

Damages and profits are distinct items of recovery, and are awarded upon quite different legal principles.

In a case like the present, the measure of damages is the profits which the plaintiffs would have made upon additional sales of its copyrighted book, had not the infringing book been competing in the market. Gross v. Van Dyk Gravure Co., 2 Cir., 1916, 230 F. 412, 414. It is often difficult, for obvious reasons, to make satisfactory proof of such damages, and the plaintiffs did not attempt to do so in the

case at bar. Where the copyright owner can show as damages his probable losses resulting from an infringement, it is clear, on familiar principles of tort liability, that all persons who unite in the infringement are jointly and severally liable for the damages resulting therefrom. Gross v. Van Dyk Gravure Co., 2 Cir., 1916, 230 F. 412.

On the other hand, accountability of an infringer for the profits he has made had its origin in equity. Stevens v. Gladding, 1854, 17 How. 447, 455, 15 L.Ed. 155. "Prior to the Copyright Act of 1909 * * * there had been no statutory provision for the recovery of profits, but that recovery had been allowed in equity both in copyright and patent cases as appropriate equitable relief incident to a decree for an injunction." Sheldon v. Metro-Goldwyn Pictures Corp., 1940, 309 U.S. 390, 399, 60 S.Ct. 681, 684, 84 L.Ed. 825. The theory was that it was unconscionable for an infringer to retain a benefit which he had received by the appropriation and use of the plaintiff's property right; and to prevent unjust enrichment the infringer was treated as a trustee ex maleficio of his ill gotten gains. As the court pointed out in L. P. Larson, Jr., Co. v. Wm. Wrigley, Jr., Co., 1928, 277 U.S. 97, 99, 100, 48 S.Ct. 449, 72 L.Ed. 800: "To call the infringer an agent or trustee is not to state a fact but merely to indicate a mode of approach and an imperfect analogy by which the wrongdoer will be made to hand over the proceeds of his wrong." Accountability for profits is therefore peculiarly personal, as equity acts on the conscience of the infringer. The presupposition is that the infringer has gotten something which it is unconscionable for him to keep; and hence it logically follows that the infringer is accountable only for the profits he received, not for the profits which may have been received by a co-infringer. Of course, when the infringement is by a partnership, the partners are jointly accountable for the whole profit made by the partnership on ordinary principles of partnership law. Callaghan v. Myers, 1888, 128 U.S. 617, 9 S.Ct. 177, 32 L.Ed. 547.

Liability of an infringer for profits is thus not by way of rough and ready reparation to the plaintiff for the *damages* which he is presumed to have suffered from the infringement. The profits which were made by the infringer may bear no relation to the damages suffered by the copyright proprietor. Thus the latter may have made no effort to exploit his copyright, in which case it would be apparent that he had not been deprived of a gain he otherwise would have made but for the infringement. Dam v. Kirk La Shelle Co., 2 Cir., 1910, 175 F. 902, 908, 41 L.R.A., N.S., 1002, 20 Ann.Cas. 1173. Again, if the copyrighted book is in an expensive de luxe edition and the infringing work a cheap edition, the profits from infringement might well come from sales in a market which the plaintiff would not have tapped anyway. Huebsch v. Arthur H. Crist Co., D.C.N.D.N.Y.1914, 209 F. 885, 894. And even where the two books are competing at the same market level, there may be substantial differences in the respective costs of the copyright proprietor and the infringer, in the effectiveness of their respective sales organizations and advertising, and in many other factors, all of which would render the profits made by the infringer wholly unreliable as an indication of the proprietor's damages, that is, the profits which he would have made but for the infringement. See Weil, Copyright Law (1917) pp. 471–73.

The basic fallacy in the plaintiffs' argument lies in their confusion of profits with damages. This is apparent from their brief: "The infringer or infringers, having preempted the position of the copyright owner and having sold or exploited the copyrighted material, should restore to the copyright owner the profits he was so prevented from making for himself. For this purpose of reparation it makes no difference how the infringers (if there be more than one) may have divided the profits among themselves; the crux of the matter is not that they, the infringers, have received profits but that they have wrongfully deprived someone else of profits which rightfully should have been his. The test of liability, that is, is not the extent of benefit received, but the extent of wrong done. The total profits resulting from the wrongful appropriation is a measure of the wrong done; admittedly it is not an entirely accurate measure, but an entirely accurate measure is impossible from the nature of the situation; * * *."

It must be conceded that expressions in some of the earlier Supreme Court cases lend countenance to the plaintiffs' argument. Thus, in Dean v. Mason, 1857, 20 How. 198, 203, 15 L.Ed. 876, the court said:

"The rule in such a case is, the amount of profits received by the unlawful use of the machines, as this, in general, is the damage done to the owner of the patent." Again, in Mowry v. Whitney, 1871, 14 Wall. 620, 653, 20 L.Ed. 860, the court said: "The profits which are recoverable against an infringer of a patent are in fact a compensation for the injury the patentee has sustained from the invasion of his right. They are the measure of his damages. Though called profits, they are really damages, and unliquidated until the decree is made." Similarly, in Littlefield v. Perry, 1874, 21 Wall. 205, 230, 22 L.Ed. 577, it was said: "Profits actually realized are usually, in a case like this, the measure of unliquidated damages."

On the other hand, the more recent cases, and the better considered of the older cases, recognize clearly enough the divergent principles upon which recovery is had for damages and for profits. In Rubber Co. v. Goodyear, 1869, 9 Wall. 788, 804, 19 L.Ed. 566, the court explained the accountability of an infringer for profits as follows: "It makes the wrong-doer liable for actual, not possible, gains. The controlling consideration is, that he shall not profit by his wrong." In Packet Co. v. Sickles, 1873, 19 Wall. 611, 617, 22 L.Ed. 203, Mr. Justice Miller, after referring to the measure of damages for infringement in an action at law, said: "The rule in suits in equity, of ascertaining by a reference to a master the profits which the defendant has made by the use of the plaintiff's invention, stands on a different principle. It is that of converting the infringer into a trustee for the patentee as regards the profits thus made; * * *." Again, in Burdell v. Denig, 1875, 92 U.S. 716, 720, 23 L.Ed. 764, Mr. Justice Miller stated: "Profits are not the primary or true criterion of damages for infringement in an action at law. That rule applies eminently and mainly to cases in equity, and is based upon the idea that the infringer shall be converted into a trustee, as to those profits, for the owner of the patent which he infringes, * * *." And see, to the same effect, a much quoted passage from the opinion of Mr. Justice Gray in Tilghman v. Proctor, 1888, 125 U.S. 136, 145, 146, 8 S.Ct. 894, 31 L.Ed. 664. In Duplate Corp. v. Triplex Safety Glass Co., 1936, 298 U.S. 448, 457, 56 S.Ct. 792, 796, 80 L.Ed. 1274, the court said: "The wrongdoer must yield the gains begotten of his wrong." Without un-duly multiplying citations, we may refer finally to the opinion of Chief Justice Hughes in Sheldon v. Metro-Goldwyn Pictures Corp., 1940, 309 U.S. 390, 399, 60 S. Ct. 681, 684, 84 L.Ed. 825, where he states that the remedy of accountability for profits "had been given in accordance with the principles governing equity jurisdiction, not to inflict punishment but to prevent an unjust enrichment * * *."

In patent cases it is well settled that co-infringers, unless they are partners, are severally accountable only for the profits each has received. Elizabeth v. Pavement Co., 1877, 97 U.S. 126, 24 L.Ed. 1000; Belknap v. Schild, 1896, 161 U.S. 10, 25, 26, 16 S.Ct. 443, 40 L.Ed. 599; Covert v. Sargent, C.C.S.D.N.Y.1889, 38 F. 237; Kissinger-Ison Co. v. Bradford Belting Co., 6 Cir., 1903, 123 F. 91, 93; Dowagiac Mfg. Co. v. Deere & Webber Co., 8 Cir., 1922, 284 F. 331, 337, 338; International Radio Telegraph Co. v. Atlantic Communication Co., 2 Cir., 1923, 290 F. 698, 703. See 3 Walker on Patents (Deller's ed., 1937) § 841. In Belknap v. Schild, supra, the court said (pages 25, 26 of 161 U.S., page 448 of 16 S. Ct., 40 L.Ed. 599): "In a suit in equity for the infringement of a patent, the ground upon which profits are recovered is that they are the benefits which have accrued to the defendants from their wrongful use of the plaintiff's invention, and for which they are liable, ex æquo et bono, to the like extent as a trustee would be who had used the trust property for his own advantage. The defendants, in any such suit, are therefore liable to account for such profits only as have accrued to themselves from the use of the invention, and not for those which have accrued to another, and in which they have no participation."

We see no reason why the same rule should not apply in the case of copyright infringement. Accountability of an infringer for profits was enforced in equity, both in patent and copyright cases, on the same equitable principles, even before the patent and copyright laws specifically authorized this relief. When, by amendment, these laws did so authorize the recovery of profits, there was no change in the principle upon which such relief had theretofore been granted by courts of equity. See Sheldon v. Metro-Goldwyn Pictures Corp., 1940, 309 U.S. 390, 399, 400, 60 S.Ct. 681, 84 L.Ed. 825. In that case the court, though

not having before it the particular point now in question, recognized (at page 400 of 309 U.S., at page 684 of 60 S.Ct., 84 L.Ed. 825) the similarity of the remedies provided in patent and copyright cases: "In passing the Copyright Act, the apparent intention of Congress was to assimilate the remedy with respect to the recovery of profits to that already recognized in patent cases. Not only is there no suggestion that Congress intended that the award of profits should be governed by a different principle in copyright cases but the contrary is clearly indicated by the committee reports on the bill."

There could be no question about this, were it not for the decision of the Supreme Court in Belford v. Scribner, 1892, 144 U.S. 488, 12 S.Ct. 734, 36 L.Ed. 514, upon which the plaintiffs chiefly rely. The facts there were strikingly similar to those in the case at bar. The infringing publisher procured his book to be manufactured under contract with a printer. In a suit for infringement, brought against the publisher and printer jointly, it appeared that the publisher had made a net profit of $1,092. No proof was offered as to the profit, if any, made by the printer in the performance of his printing contract. The lower court decreed that the two defendants were jointly liable for the profits made by the publisher. Upon appeal it was contended by the printing firm (Donohue & Henneberry) that no decree for the payment of any profits could lawfully be entered against them in the absence of proof that they had made any profits. The Supreme Court in affirming the decree below said (pages 507, 508 of 144 U.S., at page 740 of 12 S.Ct., 36 L.Ed. 514): "To this view it is replied by the plaintiff that, as the defendants Donohue & Henneberry printed the books by contract with the corporation defendant, and as, under the copyright law (Rev.St. § 4964), both the printer and the publisher are equally liable to the owner of the copyright for an infringement, and as it is to be inferred that Donohue & Henneberry made a profit from printing the piratical books, they were therefore sharers in the profits realized from the sale of the books, and were participes criminis with the defendant corporation in the infringement; that the two sets of defendants together printed and published the books, and were practically partners in doing it,—the corporation doing one part, and the other defendants the other part, of the printing and publishing; and that all the parties concerned ought to be held to an account to the owner of the copyright in respect to the profits derived from the printing, publishing, and selling, without all of which combined there could have been no infringement. We think these views are sound."

It is to be noted that the court based its opinion upon the ground that the printer and the publisher were "practically partners" in putting the infringing book on the market, a conclusion hardly justified by the facts of the case. However, the case was distinguished on this ground in Dowagiac Mfg. Co. v. Deere & Webber Co., 8 Cir., 1922, 284 F. 331, 340, and by the court below in the case at bar. If Belford v. Scribner cannot fairly be distinguished on this ground we think it is irreconcilable with the long line of cases, of which the latest is Sheldon v. Metro-Goldwyn Pictures Corp., supra, explaining the true equitable principles upon which an infringer is accountable for profits; hence we cannot accept Belford v. Scribner as a controlling authority in the instant case. But see, contra, Amdur, Copyright Law and Practice (1936) pp. 1158–1162; Caplan, The Measure of Recovery in Actions for the Infringement of Copyright (1939) 37 Mich.L.Rev. 564, 571. Colonial Press was in no proper sense a partner with Larkin in marketing the infringing book and sharing profits from the sales thereof. Its relationship to Larkin was that of an independent contractor, manufacturing the book for a fixed contract price, which was payable whether or not Larkin made any profit from the sales of the book.

So far as we can find, no case since Belford v. Scribner, involving either patent or copyright infringement, has held that co-infringers who are not partners are accountable for anything more than the profits which each infringer has individually received as a result of the infringement. In Gross v. Van Dyk Gravure Co., 2 Cir., 1916, 230 F. 412, 414, a copyright case, there was a dictum that one co-infringer "should not be charged with any part of the profits the other infringers made." We do not find that anything to the contrary was held in Haas v. Leo Feist, Inc., D.C.S.D.N.Y.1916, 234 F. 105. In that case the defendant Leo Feist, Inc., was a publishing house which employed the defendant Piantadosi as a composer of melodies. Piantadosi composed a song which was held to be an infringement of the plaintiff's copyright. The infringing song was published by the corporate defendant. A decree for an ac-

348

counting of profits went against both defendants. There is, however, nothing in the opinion to indicate that the individual defendant was to be held accountable for the net profits made by the publishing house; for all that appears, he was accountable only for what he received for the song from the corporate defendant. Nor does it appear that the corporate defendant was denied a deduction, as part of its costs, of what it paid to the individual defendant for the song. For an early case of copyright infringement in which it was recognized that each co-infringer was accountable only for the profits he received, see Stevens v. Gladding, C.C.R.I.1856, Fed. Cas.No. 13,399, 2 Curt. 608.

If the plaintiffs' theory of joint accountability were correct, then in Sheldon v. Metro-Goldwyn Pictures Corp., 1940, 309 U.S. 390, 60 S.Ct. 681, 84 L.Ed. 825, Metro-Goldwyn would have been accountable not only for the profits it received but also for profits made by independent exhibitors to whom it rented the infringing picture. In the district court, 26 F.Supp. 134, 144, 145, it was ruled as follows:

"The question has been raised as to the liability of the several defendants for the profits made by their codefendants. Section 25 of the Copyright Act requires each infringer to account for the profits it received. The statute gives the complainant the right to recover those profits from that infringer, but no other infringer is jointly liable therefor. As to the damages sustained by a complainant through the infringement of his copyright, infringers who are joint tort feasors are jointly liable. * * *

"Loew's, Inc. [an independent exhibitor], will not be held liable for the profits of the other defendants. The Pictures Corporation will not be held for the profits of Loew's."

The effort of the complainants to have each infringer charged with the aggregate profits made by all the infringers was apparently abandoned on appeal, for neither in the opinion of the circuit court of appeals (2 Cir., 106 F.2d 45) nor in that of the Supreme Court was the point further alluded to.

■ We conclude, therefore, that the district court rightly refused to charge Colonial Press with the profits made by Larkin.

Plaintiffs challenge the finding of the district court that Colonial Press made no net profit on the printing contract. This point turns on the correctness of the court's allowance of a deduction of $2,936.-25 for "overhead expenses."

Colonial's net bill to Larkin amounted to $8,091.93. Deducted from this was an item of $2,836.96 for direct labor cost in manufacturing the infringing book, an item of $1,588.24 for materials used, and an item of $994 which Colonial is obligated to pay University Press as commission for forwarding the job. Up to this point and disregarding any allowance for overhead expenses, Colonial shows an apparent profit of $2,672.73.

It might be suggested, with some force, that the profits for which an infringer is accountable should be calculated without any deduction of a fractional part of the fixed general overhead expenses which presumably would have been borne by him even had he not participated in the infringement complained of. Manufacturers are frequently glad to make a contract at a price which yields no net profit on a strict cost accounting basis but which does yield sufficient profit to carry a portion of the inescapable overhead. In such a case it would be difficult to deny that the infringer has reaped a benefit in dollars and cents from the infringement, for which he ought to be accountable. Possibly a deduction for overhead should be allowed in such a case when the infringement is innocent and denied when the infringement is conscious and deliberate. Cf. L. P. Larson, Jr., Co. v. Wm. Wrigley, Jr., Co., 1928, 277 U.S. 97, 48 S.Ct. 449, 72 L.Ed. 800; Sheldon v. Moredall Realty Corp., D.C.S.D.N.Y.1939, 29 F.Supp. 729, 730, 731.

We do not pursue this point because in the present case the plaintiffs say in their brief: "It is not contended that an infringer is barred from claiming credit for a particular expense which may be incurred in connection with the production of an infringing work simply because that expense is of a type included within 'overhead expense.'" Furthermore, the cases seem to assume, without much discussion, that the infringer is entitled to a deduction of that portion of the overhead expense properly allocable to the particular job. Rubber Co. v. Goodyear, 1869, 9 Wall. 788, 804, 19 L.Ed. 566: "The calculation is to be made as a manufacturer calculates the

profits of his business"; Myers v. Callaghan, C.C.N.D.Ill.1885, 24 F. 636, 638, 639, same case on appeal, sub nom. Callaghan v. Myers, 1888, 128 U.S. 617, 9 S.Ct. 177, 32 L.Ed. 547; Sheldon v. Metro-Goldwyn Pictures Corp., 2 Cir., 1939, 106 F.2d 45, 52, 53; Id., 1940, 309 U.S. 390, 409, 60 S.Ct. 681, 84 L.Ed. 825; Levin Bros. v. Davis Mfg. Co., 8 Cir., 1934, 72 F.2d 163; Ruth v. Stearns-Roger Mfg. Co., D.C.D. Colo.1935, 13 F.Supp. 697; Sheldon v. Moredall Realty Corp., D.C.S.D.N.Y.1939, 29 F.Supp. 729, 730, 731.

We assume that in a case like the present a deduction for overhead is allowable if properly established by proof. As stated in Sheldon v. Metro-Goldwyn Pictures Corp., 2 Cir., 1939, 106 F.2d 45, 54: " 'Overhead' which does not assist in the production of the infringement should not be credited to the infringer; that which does, should be; it is a question of fact in all cases." Section 25(b) provides that "in proving profits the plaintiff shall be required to prove sales only and the defendant shall be required to prove every element of cost which he claims * * *." The burden thus cast upon the defendant requires him to give evidence of more than a blanket undifferentiated item of "overhead"; he must give satisfactory evidence of each item of general expense or overhead, show that each item assisted in the production of the infringement, and offer a reasonably acceptable formula for allocating a portion of the general overhead to the particular job. A theoretically perfect allocation is impossible, but there must be a rough approximation within the limits of practicality.

The evidence offered by Colonial Press in respect to overhead did not, we think, meet its statutory burden of proof. Its only witness on this matter was the president of the corporation. He gave the figure of $278,382.82 as the total amount paid out for "productive labor" during 1939. $288,142.19 was the total amount of general overhead expenses for that year. Overhead for 1939 thus bore a relation of 103.5% to expenditures for productive labor. Taking 103.5% of $2,836.96—the total direct labor cost of the job of printing the infringing book—the witness testified that $2,936.25 should be allocated as the overhead expense for the particular job. The above item of $288,142.19 for overhead was computed as follows: $365,128.71 (described as "cost of sales" less costs of ma-

terial, paper and direct labor), plus a lump figure of $94,296.93 for "administrative costs", less a lump figure of $171,283.45 for "house credits," undefined. It was stated that "costs of sales" embraced "merchandise, non-productive labor, supplies, rent, depreciation, repairs, light and power, heat, insurance, house errors and other expenses." The detailed breakdown of these items was not given, except for the sum of $24,200 as rent for the premises occupied by Colonial Press. "Administrative costs" were described as including "salaries, clerical and executive, selling expense and provision for bad debts." Here, again, there was no breakdown of the individual items, except that the witness testified that the "selling expenses" amounted to $24,600. No further specific figures were given. There seems to have been one duplication. Colonial was allowed to allocate to the particular job a portion of the 1939 "selling expenses" of $24,600. It was also allowed to deduct a specific item of $994 as commission payable to the University Press for forwarding the same job.

The foregoing evidence—unsatisfactory in its generality—is an insufficient basis for a finding as to which specific items of overhead expense assisted in the production of the infringement and which did not. See Kissinger-Ison Co. v. Bradford Belting Co., 6 Cir., 1903, 123 F. 91, 94, 95; Ruth v. Stearns-Roger Mfg. Co., D.C.D.Colo. 1935, 13 F.Supp. 697, 706. It is, for instance, not apparent how the items for "house errors" and "provision for bad debts" assisted in the manufacture of the infringing book. The amount and character of "other expenses" are left wholly to speculation. It is clear that it is impossible to tell on the present record whether the relationship of 103.5% is a reasonable basis for making the allocation of overhead. Therefore, the case will have to go back to the district court for further proof on the items of overhead as they may affect the computation of the net profit or loss made by Colonial Press on the printing job.

Counsel for the plaintiffs strenuously objected to the presentation of the evidence offered by Colonial Press on overhead, because of its indefiniteness. The district court suggested in its opinion that plaintiffs "could have asked for Colonial's books and examined them in detail in order to disprove the defendant's contentions. This they did not attempt to do." [38 F.Supp. 649, 654.] We think they had

no need to do so, until Colonial Press had made out a case for the claimed deduction.

■ One matter that may affect the calculation of Colonial's net profit or loss is the fact that though Colonial's net bill to Larkin amounted to $8,091.93, it has actually received from Larkin only $6,517.01, leaving a balance owing to it of $1,574.92. If this amount of $1,574.92 is uncollectible, as may well be the case in view of the district court's finding that "Larkin was no financial colossus," Colonial will be entitled to a deduction therefor in computing its net profits. However, in the absence of evidence that this account receivable is uncollectible, no deduction will be allowed. See Ruth v. Stearns-Roger Mfg. Co., D.C.D.Colo.1935,, 13 F.Supp. 697, 707.

■ The district court committed no abuse of discretion, so far as we can see, in allowing $1500 attorney's fee as part of the costs against Larkin only and not against Colonial Press. See § 40 of the Copyright Act, 17 U.S.C.A. § 40; S. E. Hendricks Co., Inc., v. Thomas Pub. Co., 2 Cir., 1917, 242 F. 37, 42; Buck v. Crescent Gardens Operating Co., D.C.D.Mass.1939, 28 F.Supp. 576, 578.

■ No evidence of actual damages having been given, if Colonial Press made no profits for which it is accountable the assessment by the district court under § 25(b) of statutory damages against Colonial in the minimum amount of $250 cannot be reviewed upon appeal. Douglas v. Cunningham, 1935, 294 U.S. 207, 210, 55 S.Ct. 365, 79 L.Ed. 862; Hartfield v. Peterson, 2 Cir., 1937, 91 F.2d 998, 1001. However, if the district court finds after further hearing upon remand that Colonial Press made profits for which it must account, the amount of such profits will be the measure of recovery, and it will no longer be permissible to decree statutory damages "in lieu of actual damages and profits." Sheldon v. Metro-Goldwyn Pictures Corp., 1940, 309 U.S. 390, 399, 60 S.Ct. 681, 683, 84 L.Ed. 825; Davilla v. Brunswick-Balke Collender Co. of New York, 2 Cir., 1938, 94 F.2d 567, 569. Cf. Johns & Johns Printing Co. v. Paull-Pioneer Music Corp., 8 Cir., 1939, 102 F.2d 282.

■ We find nothing of substance in the cross-appeal by Colonial Press. It was clearly proper to join the printer and the publisher as co-defendants. Rule 20(a), Federal Rules of Civil Procedure, 28 U.S. C.A. following section 723c. Colonial's part in printing the infringing book under contract with the publisher Larkin rendered it liable as an infringer. Belford v. Scribner, 1892, 144 U.S. 488, 12 S.Ct. 734, 36 L.Ed. 514; Gross v. Van Dyk Gravure Co., 2 Cir., 1916, 230 F. 412. Its motion to dismiss, at the close of the hearing, was properly denied.

In No. 3735, the judgment of the District Court is vacated as to the defendant Colonial Press, Inc., without costs to either party, and the case is remanded to the District Court for further proceedings in conformity with this opinion.

In No. 3736, the appeal is dismissed, without costs.

On Petition for Rehearing.

MAGRUDER, Circuit Judge.

■ In a petition for rehearing the plaintiffs say that we read too much into the concession in their brief as to the deductibility of overhead expenses. They meant to concede no more than this: "that expenses of the overhead variety which were incurred specifically for the production of the infringing work, and which would not have been incurred but for the production of the infringing work, are deductible, but that expenses of the overhead variety which would have been incurred regardless of whether the infringing work was produced are not deductible." By way of illustration, they say, "suppose that an infringer of a copyright should rent space specifically for the purpose of doing the work of publishing and selling an infringing book, which space would not have been rented except for such particular purpose. We believe that under the decided cases the money spent for such rent, despite the fact that it constitutes 'overhead', would be deductible as a cost. On the other hand, if an infringer should conduct his infringing activity in a space which was regularly rented by him, and which would have been rented by him in any event, so that no additional rent cost was incurred because of the infringing activity, then we believe that the rent should not be allowed as a deduction." From the foregoing it is apparent that the plaintiffs are using the term "overhead" in a sense not in accord with the general accounting usage. In Webster's New International Dictionary (2d Ed., Unabridged), the term "overhead" in accounting is defined as "Those general charges or expenses, col-

lectively, in any business which cannot be charged up as belonging exclusively to any particular part of the work or product, as rent, taxes, insurance, lighting, heating, accounting and other office expenses, and depreciation; * * *." The plaintiffs' illustration of space rented specifically and exclusively for the purpose of printing the infringing book describes an expense which would not fall within the ordinary definition of "overhead" but rather would be a direct cost chargeable in its entirety to the particular job. As we read the decided cases allowing an infringer to deduct that portion of the general overhead expense properly allocable to the particular job, they are referring to "overhead" in the general accounting usage, not in the restricted sense now urged by the plaintiffs. We hold that such deduction of a proper proportion of those general overhead expenses which assisted in the production of the infringement is allowable, at least in a case like the present where the infringement was not conscious and deliberate.

The petition for rehearing is denied.